O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ORA MAE FASICK, | ) Case No. EDCV 12-1314-JPR |
| Plaintiff, | ) |
| | ) |
| vs. | ) MEMORANDUM OPINION AND ORDER |
| | ) AFFIRMING THE COMMISSIONER |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social | ) |
| Security,[1] | ) |
| | ) |
| Defendant. | ) |
| | ) |

**I.   PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying her application for Social Security disability insurance benefits ("DIB").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c).  This matter is before the Court on the parties' Joint Stipulation, filed March 26, 2013, which the Court has taken under submission without oral argument.  For the reasons stated

_____

[1]    On February 14, 2013, Colvin became the Acting Commissioner of Social Security.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court therefore substitutes Colvin for Michael J. Astrue as the proper Respondent.

below, the Commissioner's decision is affirmed and this action is dismissed.

**II.   BACKGROUND**

Plaintiff was born on September 21, 1956.  (Administrative Record ("AR") 111.)  She has a high school education and vocational training as a pharmacy technician.  (AR 156-57.)  She previously worked as a cashier, pharmacy technician, and substitute teacher.  (AR 130-36, 145-46.)

On July 25, 2009, Plaintiff filed an application for DIB. (AR 109-15.)  Plaintiff alleged that she had been unable to work since June 15, 2008, because of foot pain, back injury, anxiety attacks, "choking feeling," sleeplessness, "osteo," shortness of breath, and a work-related back injury.  (AR 111, 143.)  Her application was denied initially, on October 13, 2009 (AR 44), and upon reconsideration, on February 26, 2010 (AR 45).

On June 7, 2010, Plaintiff requested a hearing before an ALJ.  (AR 58.)  A hearing was held on May 16, 2011, at which Plaintiff, who was represented by counsel, appeared and testified; a vocational expert ("VE") also testified.  (AR 29-43.)  In a written decision issued on June 10, 2011, the ALJ determined that Plaintiff was not disabled.  (AR 8-22.)  On June 11, 2012, the Appeals Council denied Plaintiff's request for review.  (AR 1-4.)  This action followed.

**III. STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.

2

1  § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct.

2  1420, 1427, 28 L. Ed. 2d 842 (1971); <u>Parra v. Astrue</u>, 481 F.3d

3  742, 746 (9th Cir. 2007).  Substantial evidence means such

4  evidence as a reasonable person might accept as adequate to

5  support a conclusion.  <u>Richardson</u>, 402 U.S. at 401; <u>Lingenfelter</u>

6  <u>v. Astrue</u>, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than

7  a scintilla but less than a preponderance.  <u>Lingenfelter</u>, 504

8  F.3d at 1035 (citing <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880,

9  882 (9th Cir. 2006)).  To determine whether substantial evidence

10 supports a finding, the reviewing court "must review the

11 administrative record as a whole, weighing both the evidence that

12 supports and the evidence that detracts from the Commissioner's

13 conclusion." <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir.

14 1996).  "If the evidence can reasonably support either affirming

15 or reversing," the reviewing court "may not substitute its

16 judgment" for that of the Commissioner.  <u>Id.</u> at 720-21.

17 **IV.   THE EVALUATION OF DISABILITY**

18      People are "disabled" for purposes of receiving Social

19 Security benefits if they are unable to engage in any substantial

20 gainful activity owing to a physical or mental impairment that is

21 expected to result in death or which has lasted, or is expected

22 to last, for a continuous period of at least 12 months.  42

23 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257

24 (9th Cir. 1992).

25      A.   <u>The Five-Step Evaluation Process</u>

26      The ALJ follows a five-step sequential evaluation process in

27 assessing whether a claimant is disabled.  20 C.F.R.

28 § 404.1520(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th

3

Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.  § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied.  § 404.1520(a)(4)(ii).  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. § 404.1520(a)(4)(iii).  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform her past work; if so, the claimant is not disabled and the claim must be denied. § 404.1520(a)(4)(iv).  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie

---

[2]    RFC is what a claimant can still do despite existing exertional and nonexertional limitations.  20 C.F.R. § 404.1545; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

case of disability is established.  Id.  If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy.  § 404.1520(a)(4)(v).  That determination comprises the fifth and final step in the sequential analysis.  § 404.1520; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

     B.   The ALJ's Application of the Five-Step Process

     At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since May 31, 2006.[3]  (AR 13.) She found that although Plaintiff had worked after the alleged onset date, it was an "unsuccessful work attempt" and thus did not "constitute disqualifying substantial gainful activity." (Id.)   At step two, the ALJ concluded that Plaintiff had the severe impairments of "fibromyalgia; osteopenia; hypertension; mild Raynaud's syndrome; mild degenerative lumbar spine and cervical spine; neuroma in the feet, status-post surgical removals on the left; and obesity."  (Id.)  At step three, the ALJ determined that Plaintiff's impairments did not meet or equal any of the impairments in the Listing.  (AR 16.)  At step four, the ALJ found that Plaintiff retained the RFC to perform light

---

     [3]    Plaintiff's application for DIB alleged an onset date of June 15, 2008.  (See AR 111.)  In her July 2009 Disability Report, however, Plaintiff alleged that she became unable to work on May 31, 2006.  (AR 143.)

1  work.[4]  (AR 17.)   Based on the VE's testimony, the ALJ concluded

2  that Plaintiff was able to perform her past relevant work as a

3  pharmacy technician and retail cashier clerk.  (AR 21.)  At step

4  five, the ALJ concluded that Plaintiff was not disabled.  (AR

5  22.)

6  **V.   DISCUSSION**

7       Plaintiff alleges that the ALJ erred in (1) evaluating the

8  opinions of her treating physicians and (2) evaluating her

9  credibility.  (J. Stip. at 3.)   Neither contention warrants

10 reversal.

11      A.   The ALJ Properly Evaluated the Medical Evidence

12      Plaintiff contends that the ALJ failed to properly consider

13 medical evidence from her treating physicians indicating that her

14 foot impairments "significantly worsened" in June 2008 and

15 remained disabling through the date of the hearing.  (J. Stip. at

16 5-12.)  Plaintiff does not appear to contest the ALJ's findings

17 as to any impairments other than her foot pain.  (See id.)

18 Plaintiff is not entitled to remand because the ALJ provided

19 legally sufficient reasons for her evaluation of the medical

20 evidence.

21

22      [4]     "Light work" is defined as involving "lifting no more
   than 20 pounds at a time with frequent lifting or carrying of
23 objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).  The
   regulations further specify that "[e]ven though the weight lifted
24 may be very little, a job is in this category when it requires a
   good deal of walking or standing, or when it involves sitting
25 most of the time with some pushing and pulling of arm or leg
   controls."  Id.  A person capable of light work is also capable
26 of "sedentary work," which involves lifting "no more than 10
   pounds at a time and occasionally lifting or carrying [small
27 articles]" and may involve occasional walking or standing.
   § 404.1567(a)-(b).
28

1          1.   <u>Applicable law</u>

2        In determining disability, the ALJ "must develop the record

3  and interpret the medical evidence" but need not discuss "every

4  piece of evidence" in the record.  Howard v. Barnhart, 341 F.3d

5  1006, 1012 (9th Cir. 2003).  The ALJ is responsible for resolving

6  conflicts in the medical evidence.  Carmickle v. Comm'r, Soc.

7  Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008).  When evidence

8  in the record is susceptible to more than one rational

9  interpretation, the ALJ's decision must be affirmed.  Vasquez v.

10  Astrue, 572 F.3d 586, 591 (9th Cir. 2009).

11          2.   Relevant facts

12        On October 28, 2005, Plaintiff reported to Physician's

13  Assistant Nitza Glick that her "main problem is pain in her feet"

14  that "occurs exclusively as the day goes on, worse at the end of

15  the day"; she reported that there was "no pain in the morning,"

16  however.  (AR 212.)  A physical examination had "unremarkable"

17  results.  (AR 213.)  PA Glick referred Plaintiff to orthopedics

18  for her foot problems.  (AR 213-14.)

19        On August 21, 2006, Plaintiff saw Dr. Panna Shah, who noted

20  that Plaintiff reported "severe" "burning" in her feet and

21  "difficulty . . . walking and standing because of the pain."  (AR

22  239.)  A physical examination showed "diminished temperature up

23  to ankles bilaterally" and "mild signs of polyneuropathy" but

24  otherwise unremarkable results.  (AR 239-40.)  Plaintiff was

25  referred to an EMG nerve conduction study "to rule out tarsal

26  tunnel syndrome and also to further investigate her symptoms in

27  terms of sciatica."  (AR 240.)  Plaintiff underwent the nerve

28  conduction study on September 13, 2006; it returned uniformly

                              7

1   "normal" results and "no evidence of tarsal tunnel syndrome or

2   large fibre polyneuropathy." (AR 246.)  On September 14, 2006,

3   Plaintiff returned to Dr. Shah for a follow-up exam; Dr. Shah

4   noted that the nerve conduction study results were normal but

5   Plaintiff "continues to have a lot of pain in her legs and feet

6   and unfortunately has to stand at work for long hours." (AR

7   247.)  On October 25, 2006, Dr. Shah saw Plaintiff again and

8   noted that Plaintiff's "nerve conductions were normal" and she

9   "continues to have pain in her left feet and back pain" but "[a]

10  [l]ot of it is related to excess weight gain." (AR 248.)

11       On April 16, 2007, Plaintiff saw podiatrist Dr. Melissa

12  Claussen for "aching pain, burning pain, shooting pain" in her

13  feet. (AR 257.)  Dr. Claussen noted that Plaintiff's pain was

14  "made worse with putting shoes on" and "more activity" but made

15  better by "[t]aking her shoes off and rubbing her feet." (Id.)

16  She also noted that Plaintiff "has custom-molded forefoot

17  orthoses, which she says does not seem to help much." (Id.)  Dr.

18  Claussen examined Plaintiff and noted some tenderness in the feet

19  and Tinel's sign[5] with palpation of the third interspace

20  bilaterally; she also noted that Plaintiff had normal muscle

21  strength, her rheumatology workups were negative, radiology

22  "revealed no significant abnormality," Plaintiff's symptoms were

23  consistent with "systemic neuropathy or nerve etiology," and

24  _____

25       [5]   Tinel's sign is "an indication of the existence of
    something; any objective evidence of a disease . . . as opposed
26  to the subjective sensations (symptoms) of the patient."  Tinel's
    sign - definition of Tinel's sign in the medical dictionary, The
27  Free Online Medical Dictionary, Thesaurus and Encyclopedia,
    http://medical-dictionary.thefreedictionary.com/Tinel%27s+sign
28  (last visited May 22, 2013).

Plaintiff's foot tenderness was "consistent with a neuroma."  (AR 257, 263.)

On June 5, 2007, Dr. Claussen gave Plaintiff injections into the third interspace of both feet, which gave her "significant relief for several weeks."  (AR 274.)  Dr. Claussen noted that Plaintiff returned for a second injection when the "pain, burning and tingling . . . returned" because the first injections had been so effective in relieving her pain.  (Id.)

On July 16, 2007, Dr. Duc Nho Nguyen examined Plaintiff and found that her neurological symptoms were "normal" and her musculoskeletal examination showed "normal range of motion, . . . no edema and no tenderness."  (AR 284.)  Plaintiff saw Dr. Nguyen again on November 6, 2007, at which time she reported back pain and "recurrent foot pain"; Dr. Nguyen noted that Plaintiff was "following up with podiatry."  (AR 287.)

On June 19, 2008, Plaintiff saw Dr. Moses Park and reported that she continued to wear orthotic shoes for her foot pain but even in her shoes she could stand for only about an hour before having significant pain.  (AR 367.)  Dr. Park reported that an x-ray revealed a "[s]mall calcaneal heel spur" and advised Plaintiff to continue to wear orthotics, exercise, and lose weight.  (Id.)  He referred Plaintiff to orthopedics to discuss "possible resection" of a neuroma.  (Id.)  He also noted that Plaintiff's job "does not require her to stand up for prolonged of [sic] time, because she is substituting at school," but "[s]he may need to be standing for longer than an hour at a time if she returns to her original work as a pharmaceutical technician." (Id.)

9

On September 16, 2008, Plaintiff saw orthopedist Dr. Malcolm Heppenstall. (AR 379.) He noted that Plaintiff reported difficulty standing because of pain in her feet, which was not "significantly relieved" by injections. (Id.) Dr. Heppenstall examined both feet and noted "no erythema, induration or evidence of inflammation" but "definite tenderness to palpation over healed incision sites in both feet." (Id.) He also noted that Plaintiff's x-rays were "within normal limits" and her [n]eurocirculatory status is otherwise normal." (Id.) He recommended pain medication and "wider and longer shoes." (Id.) On September 30, 2008, Dr. Heppenstall reported that Plaintiff "[s]till has painful feet"; he encouraged her not to have any more cortisone injections and again suggested "appropriate wider and longer shoes," but he noted that "certainly nothing here needs surgical approach." (AR 376.)

On November 11, 2008, however, Dr. Heppenstall operated on Plaintiff to remove an interdigital neuroma in her left foot. (AR 389.) He reported that Plaintiff "tolerated the procedure well and left the operating room in good condition." (Id.) The next day, Dr. Heppenstall reported that Plaintiff was "[d]oing well post surgery." (AR 388.) On December 30, 2008, he noted that Plaintiff was "[i]mproving dramatically." (AR 395.) On January 6, 2009, he noted that Plaintiff had an infection in her foot but her "[p]ain is significantly less at this time." (AR 342.) On February 10, 2009, Dr. Heppenstall noted that Plaintiff's foot was "improving" but there was "still moderate discomfort." (AR 343.) He gave her "some foot cookies" to relieve pressure on her metatarsal head areas. (Id.) On March

17, 2009, Dr. Heppenstall noted that Plaintiff still had "moderate pain present in both feet, in the web spaces between the 3rd and 4th toes," and gave her an injection for the pain. (AR 345.)  He noted that he would see her again in two weeks and discuss "her shoes and how they relate to her foot pain."  (Id.)

On January 26, 2009, Plaintiff saw Dr. Park for a "routine visit."  (AR 340.)  Dr. Park noted that Plaintiff's sciatica "has gotten a little bit worse in the recent few weeks since she had the neuroma surgery done," but she had "[n]o significant discomfort to the foot at this time."  (Id.)  On April 27, 2009, Plaintiff again saw Dr. Park, who noted that Plaintiff had some discomfort in her left foot at the balls of the feet but "good strength" in all four extremities, "[g]ood gait[,] and normal balance."  (AR 347.)

On May 12, 2009, Plaintiff saw Dr. Heppenstall, who noted that her left foot was "still somewhat improved" but that she had "some problems" with the right foot as well.  (AR 358.)  On May 18, 2009, Plaintiff was referred by Dr. Heppenstall to Dr. Robert Klein for an electrodiagnostic study.  (AR 354.)  Dr. Klein noted that Plaintiff had "continuing" pain in her left foot after her surgery.  (Id.)  He performed a physical examination and noted that Plaintiff had "[n]ormal gait," no muscle weakness in the legs, and "equivocal Tinel's over the left tarsal tunnel with a feeling of tingling on the foot that was not experienced on the right."  (Id.)  The nerve conduction study and EMG exam showed "normal" results with "no electrical sign of peripheral neuropathy, tarsal tunnel syndrome, or lumbar radiculopathy." (Id.)

On June 2, 2009, Dr. Heppenstall noted that Plaintiff still had "moderate pain" in her left foot but "she seems to be getting about reasonably well but discomfort does persist." (AR 359.) He prescribed antiinflammatory medication. (Id.) On July 21, 2009, Dr. Heppenstall noted that Plaintiff "still has trouble between her 3rd and 4th toes, with persistent pain there," and gave her an injection. (AR 360.)

On October 6, 2009, Plaintiff underwent a consultative orthopedic examination with board-certified orthopedist Dr. William Boeck, Jr. (AR 403-09.) Dr. Boeck noted that Plaintiff drove herself to the examination. (AR 403.) Plaintiff stated that she had suffered from tingling and pain in her feet since 2005 and that orthotics did not help. (Id.) She stated that she continued to have pain in her left foot after her surgery and could wear only slippers. (Id.) She stated that the pain was aggravated by standing and walking. (Id.) Dr. Boeck observed that Plaintiff was wearing slippers and her gait was "somewhat slow with a tendency to keep the weight off the ball of the foot, particularly on the left side," but her range of motion in the feet and ankles was normal. (AR 405-07.) Based on his physical examination of Plaintiff and his observations during the examination, Dr. Boeck concluded that Plaintiff was capable of performing medium work with no postural or manipulative limitations but would "require proper orthotic management in this regard." (AR 407.)

On October 15, 2009, state agency physician Dr. S. Laiken reviewed the record and concluded that Plaintiff was capable of

1  performing medium work.[6]  (AR 417-21, 422-24.)

2      On November 17, 2009, Dr. Heppenstall noted that Plaintiff

3  "still has significant foot problems and definite tenderness

4  between the 3rd and 4th toes on her left foot." (AR 437.)  He

5  stated that "we may very well have to proceed with exploration of

6  this area, unless her discomfort resolves." (Id.)

7      On November 10, 2009, Plaintiff saw family practitioner Dr.

8  Daniel Bradford, who noted continuing pain in Plaintiff's left

9  foot as well as "complications with infection and nonhealing and

10  then scarring and recurrence of the pain." (AR 439.)  He noted

11  that Plaintiff complained that her foot pain was "still bad,

12  probably worse than before the neuroma." (Id.)  On November 24,

13  2009, Dr. Bradford saw Plaintiff for complaints of hypertension

14  and anxiety.  (AR 438.)  He also noted that Plaintiff "did get to

15  see the orthopedist and has been referred to orthopedics

16  subspecialty for continued pain in her foot." (AR 438.)  On

17  December 8, 2009, Dr. Bradford noted that Plaintiff saw a

18  specialist for her foot, who suggested reoperating on the

19  neuroma.  (AR 441.)  On December 22, 2009, Dr. Bradford noted

20  that Plaintiff had a neuroma on her toe.  (AR 440.)

21      On February 18, 2010, state-agency physician Dr. G. Rivera-

22  Miya reviewed the record and concluded that Plaintiff was capable

23  of performing medium work.  (AR 442-43.)

24

25  _____

26      [6]   "Medium work" is defined as "lifting no more than 50
   pounds at a time with frequent lifting or carrying of objects
   weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).  The
27  regulations further specify that "[i]f someone can do medium
   work, we determine that he or she can also do sedentary and light
28  work," as defined in § 404.1567(a)-(b).  Id.

13

On March 22, 2010, Dr. Bradford noted that Plaintiff had another surgery on her foot and was "quite happy with the results so far," "says the pain is better" and the site was "healing much better," and wanted to have the same surgery on the other foot. (AR 450.)  On May 25, 2010, Dr. Bradford noted that Plaintiff had surgery on her toe and her pain in that toe was "gone" but she was now experiencing pain in the toe next to it.  (AR 449.)  He noted that she had had an injection but "had no benefit from that."  (Id.)

On July 14, 2010, Plaintiff saw podiatrist Dr. John Williams, who noted a "possible recurrent neuroma in her left foot."  (AR 444.)  He noted that she had surgeries in November 2008 and March 2010, the latter of which was "more successful," but Plaintiff continued to have "shooting pain in her left foot" and "similar symptoms in her right foot but not as severe." (Id.)  Dr. Williams noted pain on palpation of the left forefoot and "minimal tenderness to palpation" in the right foot.  (Id.) He recommended a series of injections before considering additional surgeries.  (Id.)

On September 9, 2010, Dr. Bradford noted that Plaintiff "looks more comfortable than she has been in the past" and her "foot pain in the toes is gone."  (AR 446.)  He noted that Plaintiff elected not to have any more surgeries because her foot pain might be connected to her fibromyalgia.  (Id.)  On December 13, 2010, Dr. Bradford noted that Plaintiff did have another surgery "for her neuroma on her foot" and reported "[s]ome bruising there, but things are feeling better."  (AR 445.)

14

3.   Analysis

The ALJ found that Plaintiff's subjective complaints were not entirely credible and her daily activities belied her complaints of disabling pain. (AR 18.) She also made the following finding:

> The record reveals that the claimant's allegedly disabling impairment was present at approximately the same level of severity prior to the alleged onset date. The fact that the impairment did not prevent the claimant from working at that time strongly suggests that it would not currently prevent work.

(AR 18.)

The ALJ then exhaustively summarized the aforementioned medical evidence. (AR 19-21.) She gave "significant but not full weight" to Dr. Boeck's opinion that Plaintiff could perform medium work because Dr. Boeck had not had the benefit of considering Plaintiff's hearing testimony or an opportunity to review the medical evidence. (AR 21.) She also did not give great weight to the determinations of the state-agency physicians that Plaintiff could do medium work because they had not had the benefit of considering the additional evidence submitted after their review of the record, including medical evidence and Plaintiff's hearing testimony. (Id.) The ALJ noted that her determination of Plaintiff's RFC "takes into account the benign objective findings but also generously considers the claimant's subjective complaints." (AR 21.) She also noted that all of the physicians to consider Plaintiff's RFC found that Plaintiff was "not disabled" and capable of performing medium work. (Id.) She

1  gave Plaintiff the benefit of the doubt, however, and concluded
2  that Plaintiff was capable of performing only light work. (AR
3  21-22.)

4      Plaintiff argues that the ALJ erred in finding that the
5  severity of her foot pain was the same before the alleged onset
6  date as after. (J. Stip. at 4-12; AR 18.) That finding,
7  however, was supported by substantial evidence in the record.

8      The "starting point" in determining the onset of disability
9  "is the individual's statement as to when the disability began."
10 Copeland v. Bowen, 861 F.2d 536, 541 (9th Cir. 1988.) If the
11 claimant's statement is not consistent with the "medical or work
12 evidence," the ALJ must look to "additional evidence" in the
13 record "to reconcile the discrepancy." Id.

14     Here, Plaintiff alternately claimed that her disability
15 began on May 31, 2006, and June 15, 2008. (See AR 111, 143,
16 144.) Plaintiff attempted to continue working as a pharmacy
17 technician in September 2006 and as a substitute teacher
18 periodically thereafter between 2007 and 2008; she finally
19 stopped attempting to work in June 2008. (See AR 144.) As the
20 ALJ correctly found, however, the record showed that Plaintiff's
21 symptoms did not change significantly from 2006 to 2008 or indeed
22 from either of those dates until the present date.[7] To the
23 extent the ALJ erred in determining that Plaintiff's alleged
24 onset date was in May 2006 instead of June 2008, then, any such
25
26

27      [7]   Indeed, Plaintiff admits that "[if] anything, Plaintiff
28 has erred in failing to formally allege a more accurate onset
   date of September 2006." (J. Stip. at 26.)

error was harmless.[8]  See Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (nonprejudicial or irrelevant mistakes harmless).

The record showed that Plaintiff began experiencing foot pain as far back as 2005. (AR 212-14.)  From 2006 all the way through 2010, Plaintiff sought treatment for her foot pain, including surgery and injections; she reported at times that her foot pain had improved or gone away completely, and at other times she reported that the pain had come back or worsened. (See AR 239-40, 257, 274, 287, 340, 342, 343, 345, 354, 358, 359, 360, 367, 379, 388, 395, 437, 439, 444, 445, 446, 449, 450.)  Doctors who examined Plaintiff during those times noted very few significant abnormalities, and objective test results were largely normal. (See AR 213, 239-40, 246, 248, 257, 263, 284, 347, 354, 367, 379, 403-09.)  The most recent evidence in the record, Dr. Bradford's notes from September and December 2010, shows that Plaintiff's foot pain was "gone" and she was "feeling

---

[8]    Plaintiff also asserts that the ALJ erred in finding that the record did not "contain any referrals or recommendation to see a specialist" for fibromyalgia, "such as a rheumatologist," because Dr. Kenneth Epstein, who Plaintiff saw in September 2006, was a rheumatologist. (AR 14, 241-42.)  But Dr. Epstein apparently evaluated Plaintiff primarily for Lupus, not fibromyalgia, and thus the ALJ's finding that she never saw a rheumatologist for her fibromyalgia was correct; moreover, the report cited by Plaintiff doesn't mention her feet. (See AR 241-42.)  In any event, despite the paucity of medical evidence supporting Plaintiff's claims of fibromyalgia, the ALJ nonetheless concluded that it was a severe impairment, and therefore any error the ALJ might have committed in this regard was necessarily harmless. (See AR 13); Stout, 454 F.3d at 1055. Finally, the issue is irrelevant because Plaintiff does not contest the ALJ's findings as to her fibromyalgia. (See J. Stip. at 4-12.)

1  better" after her surgery.  (AR 445-46.)

2      Plaintiff cites the same evidence as the ALJ and essentially

3  argues that the ALJ should have relied on the various statements

4  in the record that Plaintiff's foot pain was worsening to find

5  her disabled, instead of relying on the various statements in the

6  record that Plaintiff's foot pain had improved or gone away

7  completely to find her not disabled.  (See J. Stip. at 4-12.)

8  But the Court must consider the ALJ's decision in the context of

9  "the entire record as a whole," and if the "evidence is

10  susceptible to more than one rational interpretation, the ALJ's

11  decision should be upheld."  Ryan v. Comm'r of Soc. Sec., 528

12  F.3d 1194, 1198 (9th Cir. 2008) (internal quotation marks

13  omitted).  Here, although certain evidence in the record, if

14  interpreted more favorably to Plaintiff, might lead to a

15  conclusion different from that reached by the ALJ, it is not this

16  Court's function to reinterpret the evidence.  Any conflict in

17  the properly supported medical evidence was the sole province of

18  the ALJ to resolve.  See Thomas v. Barnhart, 278 F.3d 947, 956-57

19  (9th Cir. 2002).  Reversal is not warranted on this basis.[9]

20  _____

21      [9]   Plaintiff also argues that the ALJ should have found
   her disabled under the Social Security Medical-Vocational
22  Guidelines (the "Grids," see 20 C.F.R. pt. 404, subpart P, app.
   200.00 et seq.) because she is "over 50 years of age, incapable
23  of performing past work with no transferrable skills and with a
   sedentary residual functional capacity at most." (See J. Stip.
24  at 12.)  As discussed herein, the ALJ properly found at step four
   that Plaintiff was capable of performing her past relevant work;
25  thus, the Grids, which are used at step five, did not apply.  See
   Hoopai v. Astrue, 499 F.3d 1071, 1075 (9th Cir. 2007).  In any
26  event, the VE testified that Plaintiff did have transferrable
   skills (see AR 41), and Plaintiff cites no evidence in the record
27  to the contrary.  And under the Grids, a person of Plaintiff's
   age and educational background who has an RFC for sedentary work
28

18

B.   <u>The ALJ Did Not Err in Assessing Plaintiff's
     Credibility</u>

Plaintiff argues that the ALJ failed to provide clear and convincing reasons for discounting her credibility. (J. Stip. at 22-30.)  Because the ALJ did provide clear and convincing reasons supporting her evaluation of Plaintiff's testimony and those reasons were supported by substantial evidence in the record, reversal is not warranted on this basis.

1.   <u>Applicable law</u>

An ALJ's assessment of pain severity and claimant credibility is entitled to "great weight." <u>See</u> <u>Weetman v. Sullivan</u>, 877 F.2d 20, 22 (9th Cir. 1989); <u>Nyman v. Heckler</u>, 779 F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." <u>Molina v. Astrue</u>, 674 F.3d 1104, 1122 (9th Cir. 2012).  In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  <u>See</u> <u>Lingenfelter</u>, 504 F.3d at 1035-36.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." <u>Id.</u> at 1036 (internal quotation marks omitted).  If such objective medical evidence exists, the ALJ may not reject a

---

(as Plaintiff concedes she does) and transferrable skills must be found "not disabled." <u>See</u> 20 C.F.R. pt. 404, subpart P, apps. 201.07, 201.08.  Thus, even if the Grids applied, the ALJ did not err in determining that Plaintiff was not disabled.

claimant's testimony "simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).  When the ALJ finds a claimant's subjective complaints not credible, the ALJ must make specific findings that support the conclusion.  See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent affirmative evidence of malingering, those findings must provide "clear and convincing" reasons for rejecting the claimant's testimony.  Lester, 81 F.3d at 834.  If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing."  Thomas, 278 F.3d at 959.

## 2.   Relevant facts

In July 2009 Plaintiff completed a Disability Report alleging that she was "in constant pain" and that "pain in both feet affects standing and walking." (AR 143.)  She alleged that lifting "over 10-15 lbs. causes back pain to penetrate down legs and into pelvic area," and the operation to remove the neuroma from her left foot left her foot pain "much worse!  Not better!" (Id.)  She stated that she had pain when showering, cooking, cleaning, and grocery shopping.  (Id.)  She also stated that her job as a pharmacy technician required her to be on her feet, as did her job as a substitute teacher, and she could not concentrate at work because the pain was all she could think about.  (Id.)  She stated that her feet "have become more painful as time goes by."  (AR 144.)

On August 1, 2009, Plaintiff filled out an Exertion Questionnaire.  (AR 159-61.)  She stated that she did not "walk

great distances unless I have too [sic]," such as "[a]round grocery store if no motor cart." (AR 159.) She stated that she could climb stairs but had to do so slowly and carefully; could not lift anything over 10 pounds but could lift laundry baskets three or four times a week and grocery baskets two or three times a week; did her own grocery shopping two to three times a week; cleaned her own home "every day," including sweeping, mopping, vacuuming, dusting, doing laundry, cooking, and gardening; could drive a car for "close to an hour" before needing to stop and stretch; and did yard work including planting, watering, weeding, and trimming plants. (AR 160, 162.) She noted that she used a motor cart for shopping but otherwise did not use any assistive devices. (AR 161.) She reiterated that her foot pain was "constant." (Id.)

In November 2009, Plaintiff filled out another Disability Report, alleging that her pain had gotten worse since the report she completed in July 2009. (AR 169.) She stated that the pain in her right foot had "gotten worse" and the pain in her left foot had "gotten so bad I can't put weight on the ball of it." (Id.) She stated that she could not put any weight on her left foot, needed to ride in a motorcart to grocery shop and needed "to have someone go and help me every time," and was in "constante [sic] pain" "to where it's all I can think about." (Id.) She stated that she needed help from family and friends "for the cleaning and general up keep" of her home. (AR 176.) She also stated that she was "walking less, because of the lump on the bottom of my left foot." (Id.)

On July 7, 2010, Plaintiff submitted a handwritten statement

21

noting that she continued to have foot pain and that her brother had come from Florida to help her with driving and household chores.  (AR 180.)

At the hearing, Plaintiff testified that she could not work because of her "left foot mostly." (AR 32.)  She stated that she had had three surgeries on her left foot but they only "made it worse." (AR 34.)  She stated that she could stand "[m]aybe 15 minutes" at a time before having to rest, could vacuum for 15 to 20 minutes at a time but it took her "three days" to vacuum her 1500-square-foot house because she needed to rest so frequently, and could not grocery shop without one of "those carts." (Id.) She testified that her pain in both feet was "getting worse." (AR 35.)  She testified that she spent "more than half of the day" sitting or lying down in a recliner.  (AR 37.)  She stated that her brother had helped her with household chores until he had a heart attack, and her husband helped "as much as he can" but was "gone a lot" for work.  (Id.)  She stated that the cortisone injections did not help her foot pain.  (AR 38.)

### 3.  Analysis

The ALJ noted that she had considered Plaintiff's testimony and her responses to the Exertional Questionnaire stating that she could not stand for more than 15 minutes at a time, walk great distances, lift more than 10 pounds, or do housework for more than 15 to 30 minutes at a time.  (AR 17-18.)  She found that Plaintiff's "allegations concerning the intensity, persistence and limiting effects of her symptoms are less than fully credible . . . because those allegations are greater than expected in light of the objective evidence of record." (AR 18.)

22

The ALJ noted that Plaintiff underwent surgery for the neuroma on her left foot, which "would normally weigh in [Plaintiff's] favor" but was "offset by the fact that the record reflects that the surgery was generally successful in relieving the symptoms." (Id.) She further noted that the "positive objective clinical and diagnostic findings since the alleged onset date . . . do not support more restrictive functional limitations than those assessed herein." (Id.) She also noted that no doctor had "endorse[d] the extent of [Plaintiff's] alleged functional limitations." (Id.) She then made the following additional findings as to Plaintiff's daily activities:

> [D]espite her impairment, the claimant has engaged in a somewhat normal level of daily activity and interaction. The claimant admitted activities of daily living including cleaning the bathroom, including the tub, shower, counters, sinks, toilet, rug, mirror and tile; she stated she was able to clean the kitchen including sweep and mop floors, counters and stove; she reported she could vacuum carpet and furniture; dust, wash laundry and cook [(AR 159-62.)]. Some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment. Although, the claimant has stated she requires frequent breaks to perform these daily activities, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily

23

activities cannot be objectively verified with any
reasonable degree of certainty.  Secondly, even if the
claimant's daily activities are truly as limited as
alleged, it is difficult to attribute that degree of
limitation to the claimant's medical condition, as
opposed to the other reasons, in view of the relatively
weak medical evidence and other factors discussed in this
decision.  Overall, the claimant's reported limited daily
activities are considered to be outweighed by the other
factors discussed in this decision.

(AR 18.)

Reversal is not warranted based on the ALJ's alleged failure
to make proper credibility findings or properly consider
Plaintiff's subjective symptoms.  The ALJ provided clear and
convincing reasons for rejecting Plaintiff's subjective symptom
testimony to the extent it was inconsistent with the RFC
assessment.  (AR 17-18.)  As the ALJ correctly found, Plaintiff's
testimony that nothing helped her foot pain and it had only
gotten worse conflicted with the notes from her treating
physicians stating that Plaintiff said her foot pain had improved
at various times with treatment.  (AR 18; see AR 193 (noting that
Plaintiff walked with a "normal gait" and was in "no acute
distress"), AR 359 (noting that Plaintiff was "getting about
reasonably well"), AR 395 (noting "dramatic" improvement in
Plaintiff's foot pain), AR 445 (Plaintiff "doing well" following
third surgery and "things are feeling better"), AR 446 (noting
that Plaintiff's "foot pain in the toes is gone"), AR 449 (noting
that after surgery Plaintiff's pain was "gone"), AR 450

24

(reporting being "happy with the results so far" and "the pain is better").)

Plaintiff argues that the fact that she underwent three surgeries shows that they conferred only a "short term benefit" and did not provide enough relief to allow her to work.  (J. Stip. at 11-12.)  While it is true that Plaintiff's foot pain appears to have come back after her first two surgeries, the most recent medical evidence in the record pertaining to her third surgery contradicts her claims that the surgery "made it worse." (AR 33-34; see AR 446 (noting in September 2010 that Plaintiff's "foot pain in the toes is gone"), AR 445 (noting that Plaintiff "doing well" in December 2010 following third surgery and "things are feeling better").)[10]  Further, test results ranging from 2006 to 2010 showed no significant abnormalities, which further cast doubt on Plaintiff's claims of debilitating pain.  (See AR 213, 239-40, 246, 248, 257, 263, 284, 347, 354, 367, 379, 402-09.) And, as the ALJ correctly found, the only doctors to have evaluated Plaintiff's functional capacity all concluded that she was not disabled and was capable of performing medium work.  (AR 403-08, 417-24, 442-43.)  The ALJ properly discounted Plaintiff's subjective testimony to the extent it conflicted with the medical record.  See Carmickle, 533 F.3d at 1161 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); Lingenfelter, 504 F.3d at 1040 (in determining credibility, ALJ may consider "whether the alleged

---

[10]   For this reason, any error arising from the ALJ's ambiguous reference to "surgery" instead of "surgeries" was harmless.

symptoms are consistent with the medical evidence"); Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); Kennelly v. Astrue, 313 F. App'x 977, 979 (9th Cir. 2009) (same).

Moreover, as the ALJ noted, Plaintiff admitted that she was able to do a wide variety of daily activities, including driving, grocery shopping, cooking, cleaning, and extensive gardening. (AR 18, 34-35, 159-61.)  That Plaintiff's allegations of disabling pain were inconsistent with her daily activities was a valid reason for the ALJ to discount her testimony.  See Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (ALJ properly discounted claimant's testimony because "she leads an active lifestyle, including cleaning, cooking, walking her dogs, and driving to appointments"); Berry, 622 F.3d at 1234-35 (holding that when claimant "told medical staff he engaged in daily walks of a mile or more, had various social engagements, drove his car and did crossword puzzles, computer work, pet care, cooking, laundry and other house-keeping," ALJ properly discounted claimant's credibility based on "inconsistencies in [claimant's] reported symptoms and activities"); Molina, 674 F.3d at 1113 ("Even where [claimant's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.").  Plaintiff asserts that the ALJ failed to take into account her statements that she could do those activities only for very limited amounts of time and needed

26

help with them (J. Stip. at 24-25), but the ALJ did take those claims into account and rejected them because they were not objectively verifiable and conflicted with the medical evidence (see AR 18).

Because the ALJ gave clear and convincing reasons for her credibility finding and those reasons were supported by substantial evidence, the Court "may not engage in second-guessing," even if it might have reached a different result.  Thomas, 278 F.3d at 959 (citation omitted).  Plaintiff is not entitled to reversal on this claim.

**VI.  CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[11] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: June 5, 2013

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[11]    This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."